[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 285.]

THE STATE OF OHIO, APPELLEE, *v*. HANNA, APPELLANT.

[Cite as *State v. Hanna,* 2002-Ohio-2221.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 1999-0093—Submitted February 5, 2002—Decided May 22, 2002.)

APPEAL from the Court of Common Pleas of Warren County, No. 98CR17677.

_____

**ALICE ROBIE RESNICK, J.**

{¶1} Defendant-appellant, James G. Hanna, has raised fifteen propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's convictions. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstances against the mitigating factors and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

{¶2} Appellant and Peter Copas were cellmates for four days at the Lebanon Correctional Institution ("LCI"). In the early morning on August 22, 1997, appellant thrust a sharpened paintbrush into Copas's right eye socket. Appellant also hit Copas in the head with a padlock placed in a sock. The paintbrush penetrated the cranial cavity and entered the brain stem. Surgeons removed the paintbrush lodged in Copas's brain; however, Copas died on September 10, 1997.

{¶3} Appellant was convicted by a jury of the aggravated murder of Copas and sentenced to death. Appellant directly appeals as a matter of right to this court, challenging his convictions and death sentence.

I. Facts and Case History

{¶4} On or about August 18, 1997, Copas was moved into appellant's cell. From the outset, Copas and appellant did not get along. Appellant was upset because prison authorities had moved Copas into his cell without appellant's prior

knowledge, because Copas had altered the condition of the cell, and because Copas had used appellant's property without his permission.

{¶5} Around August 20, 1997, Ricardo Lee, another inmate, asked appellant to allow Copas to remain in appellant's cell until Lee and Copas could become cellmates. According to Lee, appellant "acted as if he was just tolerating him as long as he could until they could move him." The next day, appellant told Lee that "Mr. Copas had bothered his TV set and broken it and that * * * he couldn't really tolerate him anymore, that [he] should do whatever [he] had to do to help him move out of the cell." During a third conversation, on the day before the murder, appellant told Lee that he had "better do something because his wick was getting short."

{¶6} On August 21, when appellant returned to his cell, he found the cell door open, and some of his belongings were "laying about" or "stolen." Appellant was upset, since "you don't leave your cell door open so that someone can come in and take your cellmate's belongings." Around 9:15 p.m., Copas returned to the cell, appeared intoxicated, crawled into his top bunk, and then vomited.

{¶7} Appellant decided "that he had had enough." Around 4:00 a.m. or 5:00 a.m. on August 22, 1997, appellant "took a paintbrush, sharpened * * * the tip of it down, took matches and lit the end that he had sharpened as to stiffen it up so that it would be brittle." Appellant created another weapon by taking "a lock off of Mr. Copas' lock box" and then placing it inside a sock. While Copas was asleep, appellant "stood up and plunged the paintbrush handle into Mr. Copas' eye," and the handle broke off. Appellant "didn't mean for it to break; * * * he wanted it to go further in than what it did, but it broke off." Appellant said that he did not stick Copas in the ear "[b]ecause the ear is too hard. You would use an ice pick in the ear. The eye is much softer."

{¶8} After being attacked, Copas "rose up out of bed" and asked, "Why the hell did you do that?" Then, appellant struck Copas in the head with the lock and

2

also "took his fist and struck" Copas. Copas passed out and fell over the television set at the foot of the bed. At that point, appellant "flushed the paintbrush handle remains and the sock down the toilet, placed the padlock back on the locker box, and then sat back in his bed" and smoked a cigarette.

{¶9} Around 6:00 a.m., Copas arose out of his unconscious condition and "jumped up, ran to the cell door and started screaming that, 'My celly's trying to kill me.' " Doug Stewart, a corrections officer at LCI, heard yelling, went to Copas's cell, and saw Copas "standing at the door, bleeding." Copas was taken to the prison infirmary. In the meantime, appellant was backed out of his cell and handcuffed. When a guard asked him what happened, appellant replied, "I told them not to put him in here with me."

{¶10} Upon arriving at the prison infirmary, Copas told Linda Young, a registered nurse, that "he was shanked in the head and hit with a battery in a sock." Copas was transferred to the Middletown Regional Hospital about thirty minutes later.

{¶11} Dr. Ralph Talkers, an emergency physician at Middletown, treated Copas for head lacerations; "his right eye was extremely swollen," consistent with an assault. However, Copas was not treated for stab wounds, since neither his medical records nor Copas himself had indicated that he had been stabbed. Dr. Talkers examined Copas's eye, but there was "no indication whatsoever" that there was a foreign object lodged in or behind his eye. Moreover, results of X-rays of the face and skull proved negative. Thus, Dr. Talkers concluded that Copas's "eye was traumatized * * * because of the blunt injury" during the assault.

{¶12} According to Dr. Talkers, a CAT (computerized axial tomography) scan of Copas's head was not conducted, since "the patient was awake and talking and did not have * * * focal neurological findings." Moreover, Copas was "observed in the emergency room for approximately five hours" and never lost

consciousness. Copas was sent back to the prison infirmary and arrived at around 1:45 p.m. on August 22.

{¶13} Dr. James McWeeney, the medical director at LCI, found that Copas was "very lucid," and "his speech was clear and deliberate" when he examined Copas on August 23. According to Dr. McWeeney, Copas "did not exhibit any signs of an intracranial injury or severe head trauma." However, Dr. McWeeney ordered an ophthalmology consult and a CAT scan.

{¶14} On August 26, 1997, Dr. Steven Katz, a neuro-ophthalmologist, examined Copas at the Corrections Medical Center. Copas's eye was swollen, and there appeared to be "swelling or congestion in the socket behind the eye." A CAT scan completed later that evening showed "a large foreign object * * * like a pen or pencil * * * lodged in the socket just behind the eye, inside the eye muscle cone." According to Dr. Katz, "it appeared to penetrate the pons, which is part of the brain stem, and go back far enough to enter the cerebellum."

{¶15} On August 27, 1997, neurosurgeons conducted a "pterional craniotomy" and removed the remnant of the paintbrush, which was approximately five inches long, from inside Copas's head. Copas recovered "very quickly from surgery" and was treated with "broad-spectrum intravenous antibiotics" to fight possible infection. However, on September 5, 1997, his medical condition deteriorated. Copas died on September 10, 1997.

{¶16} Dr. Keith Norton, a Franklin County forensic pathologist and deputy coroner, concluded that Copas had suffered extensive brain injuries extending into the cerebellum. These injuries included bleeding surrounding the underside of the brain, swelling of the brain, insufficient blood flow to the brain's nerve cells, and "bacterial colonies in the basilar meninges." Dr. Norton stated that "the penetrating injury to the head" caused by the paintbrush was the cause of death.

{¶17} At trial, the prosecution introduced appellant's letter to Dennis Borowski, an inmate at the Southern Ohio Correctional Facility ("SOCF"). In the

letter, dated January 10, 1998, appellant stated, "Well, it's like this Dennis, I caught a murder #1 case on my cellie at Lebanon. He was a maggot baby-raper-killer I found out, and those idiots of the administration there wouldn't move him the hell out of my cell, so I took him out of his misery. I made him suffer pretty good too, because first of all, I stabbed one of his eyeballs up out of its socket, and then I beat all on his stupid-ass-head off-and-on for two (2) hours (4:00 a.m. to 6:00 a.m.) in the morning until count time when they came and got us both up out of the cell. — He lived for twenty-and-a-half (20½) hours after that before he croaked."

{¶18} Bryan Freeze, an inmate at LCI in August 1997, was appellant's cellmate before Copas. Three or four days after the August 22 incident, Freeze and appellant were in the segregation unit at the prison. Freeze asked appellant about the attack. In response, appellant admitted stabbing Copas in the eye and said, "I tried to bash the mother fucker's brains in." Freeze asked appellant "why he had done it," and appellant said, that Copas "had turned his TV off on him."

{¶19} Barnard Williams, a state investigator, talked to Copas at the Middletown Regional Hospital on August 22, 1997. Copas said that prior to the attack, he had put on head phones and had put a white T-shirt over his eyes so that he could sleep better. He then "laid there for a couple of hours and was sleeping." Then, Copas said, "I felt something hit my head, by my mouth area. I looked up, but I don't know what [happened]. I saw [appellant's] hand covered with a gauze, with a pencil like shank in it. He hit me with it and I sat up trying to protect myself." Thereafter, appellant hit him with the lock in the sock. After he had been hit four or five times, Copas said, "I tried to plead with him but he kept hitting me."

{¶20} Dr. Bruce Janiak, an emergency physician, testified by videotaped deposition that Copas should have received a CAT scan of his head during medical treatment on August 22, 1997. Dr. Janiak reached that opinion "because it's well-known in the literature that in instances which I described, i.e., the head injury with questionable loss of consciousness and in addition the vomiting, that that would be

an indication for a head CAT scan, and that's the standard, * * * so I think it should have been." Furthermore, Dr. Janiak stated, "I can say with 100 percent certainty that had a CAT scan been done, you would have seen the piece of wood and known that there was a foreign body." Finally, Dr. Janiak testified that earlier removal of the wooden shaft from inside Copas's head would have reduced the possibility of infection.

{¶21} Dr. Paul Schwetschenau, a neurosurgeon, agreed with the coroner's findings that Copas had died of a brain infarction from a massive subarachnoid hemorrhage. He surmised that the hemorrhage was caused by "trauma to the blood vessels or bacterial weakening of the wall of the blood vessels." In Dr. Schwetschenau's opinion, a CAT scan would have "revealed the presence of a wooden object in Mr. Copas's brain," and its "earlier detection and removal would have significantly improved the chances of reducing the bacterial contamination and the bacterial growth."

{¶22} Dr. Schwetschenau also reviewed Copas's frontal X-ray of August 22 and identified "two very distinct parallel lines that are not natural and do not belong in anybody's skull." Dr. Schwetschenau testified, "I believe that this is the outline or the size of a straight or cylindrical object."

{¶23} The grand jury indicted appellant for aggravated murder with prior calculation and design with two death penalty specifications. The specifications were for murder committed in a detention facility pursuant to R.C. 2929.04(A)(4), and for conviction of a prior purposeful killing pursuant to R.C. 2929.04(A)(5).

{¶24} Appellant was also indicted with a third specification for being a repeat violent offender as defined in R.C. 2929.01. In a second count, he was indicted for possession of a deadly weapon under detention and charged with an accompanying specification for being a repeat violent offender.

{¶25} The jury found appellant guilty of Count One and the R.C. 2929.04(A)(4) specification. Upon appellant's election, the trial judge separately

6

found appellant guilty of the R.C. 2929.04(A)(5) specification and the repeat violent offender specification. Count Two and the accompanying specification were dismissed.

{¶26} The jury recommended death for Copas's murder. The trial court sentenced appellant to death for Copas's murder and eight years for the repeat violent offender specification.

## II. Trial Issues

### A. Warden's Testimony

{¶27} In his first proposition of law, appellant claims that the trial court erred by refusing to allow LCI Warden Harry Russell's testimony about shanks or weapons confiscated at the prison and the charges filed against inmates for possessing such weapons. Appellant asserts that this information would show that prisoners' possession of weapons is common and does not indicate intent to kill. In support, at trial, appellant proffered an exhibit "concerning the number of shanks and other weapons at LCI that have been confiscated" and "charges that were filed in relation to possession and use of those items." The trial court rejected the warden's testimony, finding that it was not relevant and that its probative value was outweighed by its prejudicial impact.

{¶28} The admission of Warden Russell's testimony rested upon a question of relevancy. Evid.R. 401 provides, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. See *State v. Sage* (1987), 31 Ohio St.3d 173, 180, 31 OBR 375, 510 N.E.2d 343.

{¶29} Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." When considering

evidence under Evid.R. 403, the trial court is vested with broad discretion, and an appellate court should not interfere absent a clear abuse of discretion. *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675, citing *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267.

**{¶30}** The trial court could legitimately conclude that the warden's testimony focused on side issues (e.g., prison administration, inmate discipline, and inmate violence) substantially unrelated and prejudicial to a fair resolution of the issues in this case. Thus, we find no abuse of discretion in excluding Warden Russell's testimony.

**{¶31}** Finally, appellant argues that the jury should have been allowed to consider the warden's testimony as part of the nature and circumstances of the offense during sentencing.

**{¶32}** The Eighth Amendment to the United States Constitution addresses criminal sentencing. It "allows a capital defendant to introduce 'any aspect of [his] character or record and *any of the circumstances of the offense* that the defendant proffers as a basis for a sentence less than death.' " (Emphasis sic.) *State v. Sanders* (2001), 92 Ohio St.3d 245, 266, 750 N.E.2d 90, quoting *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. R.C. 2929.04(B) also requires the sentencer to consider "the nature and circumstances of the offense." The warden's testimony regarding the number of shanks present, the number confiscated, and the general use of shanks within LCI was not related to the circumstances of appellant's offense. Such evidence did not provide relevant mitigation. Accordingly, we reject appellant's first proposition.

## B. Jury View

**{¶33}** In his third proposition of law, appellant asserts that the trial court abused its discretion in denying his request for a jury view. Appellant claims a jury view was necessary to show the jurors "the size and shape of the cell, the lighting conditions in the cell, and the positioning of Peter Copas at the time of the assault"

so that the jury could see "how difficult it would be for James Hanna to intentionally stab Peter Copas in the eye."

{¶34} R.C. 2945.16 provides, "When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted * * * to such place * * *." Moreover, "the trial court is vested with a broad discretion in such matters, and its judgment will not be disturbed absent an abuse of discretion." *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585 (denying jury view of confinement cell). See, also, *Sanders*, 92 Ohio St.3d at 265, 750 N.E.2d 90 (denying jury view of prison).

{¶35} The trial court overruled appellant's motion for a jury view because of "the inherent problems of security and possible prejudice to the case via other inmates." Moreover, the trial court held that "the dimensions and all aspects of the cell can be fully presented to the jury with the aid of diagrams and photographs and without them being physically present." Thus, we find no abuse of discretion.

{¶36} Although he claims that the state's photographs were insufficient, appellant failed to present any diagrams of his cell during the trial. Appellant also fails to demonstrate that diagrams and photographs of the cell were inadequate to provide the jury with a full understanding of conditions in his cell. Accordingly, we reject appellant's third proposition.

### C. Sufficiency of the Evidence

{¶37} In his sixth proposition of law, appellant challenges the sufficiency of the evidence showing appellant's prior calculation and design. He claims that his use of weapons (e.g., a shank and a lock in a sock), the location of stab wounds in a nonvital organ, and Copas's medical care showed that he intended only to injure Copas and not to kill him.

{¶38} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶39} As to prior calculation and design, no "bright-line test" exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82. In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph three of the syllabus, this court held that "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified."

{¶40} Appellant's intent to kill Copas was clearly proved. Not only did appellant express hostility towards Copas over a four-day period prior to the attack, but he also fashioned a paintbrush into a murder weapon an hour or so before the attack. Appellant then thrust the shank into Copas's eye when he was most vulnerable, while asleep. Moreover, appellant told investigators that he wanted the shank to "go further in than what it did, but it broke off." In his letter to another inmate, appellant boasted that he "stabbed one of [the victim's] eyeballs," and beat "on his stupid-ass-head" for two hours. Thus, there was compelling evidence that appellant purposely murdered Copas with prior calculation and design.

{¶41} Appellant also claims that the prevalence of shanks in prison and their use in nonlethal altercations showed that he had never intended to kill Copas. However, appellant's action in planning and carrying out the attack and not his

choice of weapon (i.e., a shank) showed that he intended to murder Copas and did so with prior calculation and design. In *Zuern*, 32 Ohio St.3d at 62, 512 N.E.2d 585, a prison inmate stabbed a corrections officer with a shank. The prisoner fashioned the shank into the "desired shape" and "sharpened it to a very fine edge" prior to the murder. Under these facts, *Zuern* held that the defendant's actions showed that he had acted with prior calculation and design. Similarly, appellant's actions leading up to the murder demonstrated his prior calculation and design.

{¶42} Further, appellant argues that he stabbed Copas in a nonvital organ (i.e., the eye), and this showed that he never intended to kill him. In reality, appellant stabbed Copas in one of the most vital areas of the body by thrusting the shank through the soft tissue area of Copas's eye and into his cerebellum. Cf. *State v. Phillips* (1995), 74 Ohio St.3d 72, 81-82, 656 N.E.2d 643 (intent to kill shown by defendant's blows to the victim's "head, certainly a vital area"). Moreover, appellant admitted that he "wanted [the shank] to go further in than what it did, but it broke off." Thus, we also reject this argument.

{¶43} Finally, appellant claims that he could not have known that he had inflicted a fatal wound on Copas, since two doctors failed to recognize the seriousness of Copas's injuries when he was taken to the emergency room. This argument ignores a significant fact. Appellant knew that a long segment of the shank was lodged deep inside Copas's head, whereas the physicians did not know that fact. Thus, appellant's intent had nothing to do with the doctors' awareness of Copas's injuries. Accordingly, we reject appellant's sixth proposition.

### D. Guilt Phase Instructions

{¶44} In his second proposition of law, appellant argues that the trial court erred in rejecting his proposed instruction on medical malpractice as an independent cause of death.

{¶45} Generally, "one who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful

medical treatment may have saved his life." *State v. Johnson* (1978), 56 Ohio St.2d 35, 40, 10 O.O.3d 78, 381 N.E.2d 637. Moreover, "medical treatment for homicide victims is not an intervening cause." *State v. Carter* (1992), 64 Ohio St.3d 218, 226, 594 N.E.2d 595. "Only gross negligence or willful maltreatment will relieve the defendant from liability. Simple negligence is not enough." (Citation omitted.) *State v. Beaver* (1997), 119 Ohio App.3d 385, 394, 695 N.E.2d 332. See, also, Annotation, Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant (1997), 50 A.L.R.5th 467.

**{¶46}** Appellant proposed the following jury instruction on intervening cause, relying on *Johnson*, 56 Ohio St.2d at 40, 10 O.O.3d 78, 381 N.E.2d 637: "[O]ne who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life. This rule has been qualified where there has been a gross or willful maltreatment of the patient by the medical personnel which is shown to have been an independent intervening cause of the patient's death." (Citations omitted.)

**{¶47}** The trial court refused to give the proffered instruction. The court stated that the issue was "sufficiently covered" and found the proposed instruction to be "duplicative at best and confusing at worst." Rather, the trial court provided jury instructions on intervening cause and independent intervening cause based on 4 Ohio Jury Instructions ("OJI"), Section 409.56, as follows:

**{¶48}** "Intervening causes. The defendant is responsible for the natural consequences of the defendant's unlawful act, even though death was also caused by the intervening act of another person or agency."

**{¶49}** "Independent intervening cause of death. If the defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was something else or someone else, the defendant who inflicted the original injury is not responsible for the death."

**{¶50}** Appellant was not entitled to his instruction on independent intervening cause. First, the trial court provided adequate instructions from OJI on intervening cause and independent intervening cause of death.

**{¶51}** Second, there was no evidence that Copas was the victim of gross or willful maltreatment. There were no clinical symptoms of neurological damage when Dr. Talkers treated Copas. The patient was wide awake and talking, and Copas was observed in the emergency room and never lost consciousness. Based upon these observations and the history provided to him by Copas, Dr. Talkers concluded that a CAT scan was not warranted. Even though defense experts testified that Dr. Talkers breached the standard of care by not ordering a CAT scan, the evidence at most is conflicting on this point and would not support a finding of gross negligence or willful maltreatment. Cf. *Cook v. Foltz* (C.A.6, 1987), 814 F.2d 1109, 1113 (not entitled to instruction on grossly erroneous medical treatment where the record did not support such a claim).

**{¶52}** Finally, the coroner's testimony established that appellant's attack was the cause of Copas's death. According to Dr. Norton, the deputy coroner, "the penetrating injury to the head, the instrument going in is what caused death." Indeed, Dr. Janiak, the defense expert, concurred in the coroner's findings. He stated that, "clearly the foreign body was responsible for multiple problems that ensued" with the victim. Therefore, we find that the trial court did not err by rejecting appellant's proposed jury instruction. We reject appellant's second proposition.

**{¶53}** In his seventh proposition of law, appellant contends that the instructions defining causation in terms of foreseeability undermined the burden of proof on the mens rea element of the aggravated murder charge. See *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819. Appellant objects to the following jury instruction: "The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The defendant is also

responsible for the natural and foreseeable results that follow, in the ordinary course of events, from the act."

**{¶54}** We have recognized that the use of the foreseeability instruction in aggravated murder cases is questionable. See *Burchfield*, 66 Ohio St.3d at 263, 611 N.E.2d 819; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 346, 703 N.E.2d 1251. However, "[t]he use of that instruction * * * does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips,* 74 Ohio St.3d at 100, 656 N.E.2d 643. Accord *State v. Frazier* (1995), 73 Ohio St.3d 323, 331, 652 N.E.2d 1000.

**{¶55}** In the case sub judice, the trial court provided the jury with extensive instructions on the state's burden of proof and the requirement to prove purpose to kill both before and after the foreseeability instruction was given to the jury. Thus, the instructions as a whole made clear that the jury was required to find purpose to kill in order to convict. See *Phillips*, 74 Ohio St.3d at 100, 656 N.E.2d 643. We find no prejudicial error and reject appellant's seventh proposition.

**{¶56}** In his fourteenth proposition of law, appellant challenges the instructions on reasonable doubt during both the guilt and sentencing phases of the trial. However, appellant failed to object to these instructions at trial and waived all but plain error. Crim.R. 30(A); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraphs one and two of the syllabus. Moreover, appellant's complaints about the statutory definition of "reasonable doubt" lack merit. See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163; *State v. Hessler* (2000), 90 Ohio St.3d 108, 115, 734 N.E.2d 1237; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. See, also, *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916; *State v. Taylor*, 78 Ohio St.3d at 29, 676 N.E.2d 82. We reject appellant's fourteenth proposition.

### E. Sealing the Prosecutor's File

**{¶57}** In his eighth proposition of law, appellant argues that the trial court erred by failing to order the prosecution to seal its file upon discovering that the prosecution had failed to disclose exculpatory information. Appellant filed a pretrial motion requesting that a complete copy of the prosecutor's file be made, reviewed by the trial court, and sealed for appellate review. The trial court denied this motion.

**{¶58}** As Trooper James Ertel reviewed his investigative report to refresh his recollection, it appeared that the report disclosed possible exculpatory information. The trial court ordered the prosecution to provide this information to the defense, which it did. The defense made no further motions to seal the prosecutor's file.

**{¶59}** According to appellant, the trial court was alerted to the possibility that the prosecutor's file might contain other *Brady* material after Ertel's report was disclosed. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Thus, appellant argues that the trial court had a sua sponte obligation to review and seal the prosecutor's file.

**{¶60}** The trial court was not required to examine the prosecutor's file to determine the prosecutor's truthfulness or seal the prosecutor's file for purposes of appellate review. Cf. *State v. Chinn* (1999), 85 Ohio St.3d 548, 569, 709 N.E.2d 1166; *State v. Williams* (1995), 73 Ohio St.3d 153, 172, 652 N.E.2d 721. The prosecutor was fully aware of his continuing obligation to divulge exculpatory evidence. Appellant's claim that the prosecution may have withheld other exculpatory evidence from the defense is purely speculative. The record discloses no such evidence, and we reject appellant's eighth proposition.

### F. Prosecutorial Misconduct

**{¶61}** In his ninth proposition of law, appellant contends that he was denied a fair trial due to prosecutorial misconduct during the guilt phase. "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they

prejudicially affected substantial rights of the accused." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. However, the touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

1. Denigrating Reasonable Doubt

**{¶62}** Appellant complains that the prosecutor denigrated the reasonable doubt standard during voir dire when he compared crossing a bridge to making decisions about the most important daily affairs.

**{¶63}** A prospective juror, an engineer, stated that as "an engineer, you want facts, everything to be backed up with facts." While discussing the concept of reasonable doubt, the prosecutor asked this prospective juror the following series of questions:

**{¶64}** "Q: Have you ever driven down 75 over the river to Kentucky, over * * * the Brent Spence bridge?

**{¶65}** "A: Uh-huh.

**{¶66}** "Q: Okay. And you had your family with you?

**{¶67}** "A: Uh-huh.

**{¶68}** "Q: I'll ask you this because you're the engineer. Did you ever stop before you got to the bridge and get out and check the bridge to make sure it was safe before you crossed?

**{¶69}** "A: (Juror moves head from side to side.)

**{¶70}** "* * *

**{¶71}** "Q: But you crossed the bridge, didn't you?

**{¶72}** "A: Yes.

**{¶73}** "Q: That was an important affair, was it not?

**{¶74}** "A: Uh-huh.

**{¶75}** "Q: So you understand we talk about important affairs, we do important things every day. And I'm asking you not to do any more than you do every day in your important affairs in deciding this case; can you do that?

**{¶76}** "A: Uh-huh."

**{¶77}** The defense counsel did not object to the prosecutor's questions and thus waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

**{¶78}** Moreover, the defense counsel used the prosecutor's bridge analogy to appellant's advantage during subsequent voir dire and opening statement. In his opening statement, defense counsel stated, "In jury questioning, the prosecutor Mr. Beaton talked to you a little bit about a bridge in Cincinnati and how you don't stop and look under the bridge before you drive over it and you assume it's okay. * * * I know some of you are old enough to remember the Silver Bridge collapse over the Ohio River and, in fact, that happened. * * * What I'm asking you to do in this case is listen to all the evidence. You make the prosecutor take you under the bridge and show you the underpinnings and show you it's clear. And if he cannot do that, he hasn't proven his case."

**{¶79}** While the prosecutor's comments were perhaps inappropriate, we do not find that the comments denigrated the reasonable doubt standard. Moreover, the trial court's "reasonable-doubt instructions negated any misconception by the jury." *State v. Lundgren* (1995), 73 Ohio St.3d 474, 484, 653 N.E.2d 304. In any event, appellant shows no prejudice. Appellant turned the tables on the state by effectively using the bridge analogy in presenting his own defense. Accordingly, we reject this claim.

2. Peremptory Challenge of "Death Hesitant" Jurors

**{¶80}** Appellant also argues that the prosecutor improperly exercised his peremptory challenges to exclude three jurors who had expressed reluctance to impose the death penalty. However, " 'apart from excluding jurors based on race

or gender, "prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control." ' " *State v. Biros* (1997), 78 Ohio St.3d 426, 443, 678 N.E.2d 891, quoting *State v. Ballew* (1996), 76 Ohio St.3d 244, 253, 667 N.E.2d 369. Thus, we reject this assertion.

### 3. Failure to Comply with Discovery Requests

**{¶81}** Appellant argues that the prosecutor committed misconduct by failing to provide the defense with exculpatory information from Ertel's investigative report until ordered to do so at trial, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Information provided to the defense from Ertel's report included Officer Hagar's statement that Copas was unconscious after the attack, statements that Copas was intoxicated at the time of the attack, and interviews of inmates from appellant's cellblock reporting what they heard on the night of the attack.

**{¶82}** Despite appellant's claims, the state did not violate *Brady v. Maryland* by withholding exculpatory evidence. Ertel's report was presented *during* the trial (and not after the trial as in *Brady*), and no *Brady* violation exists. See *State v. Green* (2000), 90 Ohio St.3d 352, 372, 738 N.E.2d 1208; *State v. Wickline* (1990), 50 Ohio St.3d 114, 116, 552 N.E.2d 913.

### 4. Improper Closing Argument

**{¶83}** Appellant claims that the prosecutor committed misconduct during his closing argument by suggesting that murder one was the same as prior calculation and design. Appellant attacks the following segment of the prosecutor's closing argument: "* * * [T]elling Trooper Ertel and Scott Male what happened wasn't good enough. He had to tell somebody else what he had done. And he wrote a letter * * * to another inmate, * * * Dennis Borowski. That letter was written in January, 1998, about two weeks before the defendant was indicted for this charge, for this crime. And in that letter he used the term murder one case. I caught a murder one case on my celly in Lebanon. Murder one. Ladies and

gentlemen, *I suggest, submit to you that's a term that most people recognize as synonymous with premeditated murder*. And he was telling somebody this before he'd even been charged, before he even knew that he would be facing this." (Emphasis added.)

**{¶84}** However, appellant failed to object to this argument and thus waived all but plain error. See *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. No such error occurred.

**{¶85}** "Prosecutors are entitled to some latitude in arguing what the evidence has shown and what the jury may infer from the evidence." *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 169, 749 N.E.2d 226.

**{¶86}** Moreover, contrary to appellant's claim, the prosecutor was not equating "murder one" with "prior calculation and design." Rather, the prosecutor used appellant's own words (i.e., from his letter to Borowski) to prove that he intended to murder Copas. Appellant's own words, as the prosecutor pointed out, contradicted appellant's defense that he intended only to injure Copas, not kill him. The prosecutor's argument represented fair comment on the evidence. *Tibbetts,* 92 Ohio St.3d at 168, 749 N.E.2d 226.

**{¶87}** In summary, we find no prosecutorial misconduct during the guilt phase justifying reversal, and we reject appellant's ninth proposition.

### III. Penalty Phase Issues

### A. Prosecutorial Misconduct

**{¶88}** In his tenth proposition of law, appellant argues that the prosecutor committed misconduct during the penalty phase's closing arguments. The test for prosecutorial misconduct in closing arguments is " 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler*, 90 Ohio St.3d at 125, 734 N.E.2d 1237, quoting *State v. Smith*, 14 Ohio St.3d at 14, 14 OBR 317, 470 N.E.2d 883.

**{¶89}** However, appellant failed to object to the portions of the prosecutor's argument that he complains about now. Thus, he waived all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. No plain error occurred. Moreover, as discussed below, none of the allegations of prosecutorial misconduct has merit.

1. Misleading the Jury About Life Imprisonment Without Parole

**{¶90}** Appellant claims that the prosecutor improperly argued that he would not be punished for his crime if he did not receive a death sentence. Appellant objects to the prosecutor's rebuttal argument: "Now, ladies and gentlemen, if you don't decide on the death penalty in this case, nothing really is going to change for the Defendant. He's still going to—things are going to go on as usual. He's got three meals a day, he's got a roof over his head. Granted, he's locked up in prison. But, so, he's been locked up in prison for a while. He doesn't have any worries. Doesn't have to go to work. As I said, life's pretty much the same."

**{¶91}** The prosecutor's argument was not improper, since it rebutted defense assertions that the severity of life in prison without parole was a mitigating factor. According to defense arguments, appellant would be sent to a maximum security prison, he would be kept away from other inmates, he could not leave his cell "unless he's in the company of guards under high security," and "[l]ike the death penalty, this life sentence is unchangeable."

**{¶92}** The "state may * * * comment upon 'evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant,' " and thus the prosecutor's rebuttal was proper. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 464, 705 N.E.2d 329, quoting *State v. Gumm* (1995), 73 Ohio St.3d 413, 421, 653 N.E.2d 253.

2. Belittling Mitigation

**{¶93}** Appellant complains that the prosecutor improperly minimized the severity of his abuse as a child by labeling it acceptable parenting. Appellant points

20

to the prosecutor's comments that "it wasn't unusual back then [the 1950s] if you were bad that you'd get swatted with a paddle on your rear."

**{¶94}** The prosecutor's comments simply responded to defense claims that a mitigating factor in appellant's case was the "history of a dysfunctional family, an aggressive mother, [and] inconsistent and hostile treatment." The prosecutor's remarks did not belittle the abuse that appellant suffered. Rather, the prosecutor's rebuttal placed the mother's actions in the context of her personal situation (i.e., the hardships of a single mother with six children at home) and suggested the acceptability of harsher forms of corporal punishment during the 1950s. Thus, the prosecutor's rebuttal argument represented fair comment. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 572, 605 N.E.2d 884.

**{¶95}** Appellant also claims that the prosecutor belittled the long-term effects of appellant's impoverished background. Specifically, appellant complains about the following remarks: "They talk about this house — to play on your emotions, they talk about this house with no plumbing. Now, you might want to laugh, but Abe Lincoln didn't have any plumbing. If any of you have traveled in other parts of the world, other people live in conditions without electricity or without plumbing."

**{¶96}** The prosecutor's comparison to Lincoln was a way to point out that many people rise from impoverished backgrounds similar to appellant's. By so doing, the prosecutor was simply arguing that the jury should give appellant's background little weight in mitigation. See *State v. Richey* (1992), 64 Ohio St.3d 353, 370, 595 N.E.2d 915. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292. Moreover, prosecutors are "afforded wide latitude during closing argument" and can be "colorful or creative." *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. The prosecutor's argument was not improper.

**{¶97}** Finally, appellant claims that the prosecutor erred by comparing him with his brothers and sisters. The prosecutor argued that while his brothers and sisters came from the same family environment, only appellant ended up in adult prison.

**{¶98}** The prosecutor could legitimately argue that appellant's brothers and sisters came from the same deprived background but did not kill anybody or end up in adult prison. See *Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292; *Richey*, 64 Ohio St.3d at 370, 595 N.E.2d 915. Moreover, the record supported the prosecutor's argument.

**{¶99}** In summary, we find no prosecutorial misconduct during the penalty phase, and we reject appellant's tenth proposition.

B.  Sentencing Opinion

{¶100} In his twelfth proposition of law, appellant argues that his death sentence should be reversed because of flaws in the trial court's sentencing opinion.

{¶101} First, appellant claims that the trial court improperly compared him with his siblings by stating that "[n]one of his siblings [has] been involved in any felony crime," while he has been in prison for "nearly twenty years."  However, such comparison was not improper.  See *State v. Campbell* (2000), 90 Ohio St.3d 320, 343, 738 N.E.2d 1178; *State v. White* (1999), 85 Ohio St.3d 433, 450, 709 N.E.2d 140.

{¶102} Second, appellant argues that the trial court improperly evaluated evidence of his various psychological and mental disorders.  Appellant complains that the trial court incorrectly evaluated such evidence when finding that "[t]he court fails to see any relationship * * * between the contended character and/or psychological defects advocated by the defendant and the actions in this case which would warrant a finding in mitigation."

{¶103} This court has stated that "the assessment and weight to be given mitigating evidence are matters for the trial court's determination."  *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293.  Moreover, "[t]he fact mitigation evidence is admissible 'does not automatically mean it must be given any weight.' "  *Hill* at 441, 653 N.E.2d 271, quoting *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.  The sentencing opinion fully reviewed Dr. Kathleen Burch's testimony about appellant's character and psychological defects.  The trial court could reasonably assign any or no weight to such evidence.  Thus, there was no error.

{¶104} Third, appellant incorrectly asserts that the trial court failed to consider his offer to plead guilty.  The trial court specifically mentioned that appellant "had asked for the prosecution to allow him to plead guilty as charged

and accept a sentence of life in prison without parole." However, the trial court gave "no weight" to appellant's offer to plead, since he was already serving a life sentence for aggravated murder and attempted aggravated murder, and thus "his offer to plea was conceding little regardless of the outcome of the trial." The trial court exercised permissible discretion in giving no weight to appellant's offer to plead. Cf. *State v. Stumpf* (1987), 32 Ohio St.3d 95, 106, 512 N.E.2d 598 (guilty plea in face of a hopeless trial entitled to little weight as mitigation).

{¶105} Appellant also contends that the trial court failed to consider evidence that he was sexually abused as a child. The trial court's sentencing opinion did not specifically mention appellant's child abuse. However, it is clear that the trial judge carefully considered Dr. Burch's testimony, since he discussed Dr. Burch's opinions about appellant's various psychological disorders. Thus, there was no error.

{¶106} We find that the trial court's sentencing opinion fully complied with the requirements of R.C. 2929.03 and R.C. 2929.04. For these reasons, we reject appellant's twelfth proposition.

## C. Proportionality

{¶107} In his fourth proposition of law, appellant argues that the death penalty is disproportionate when his case is compared to similar cases in which the death penalty has been imposed. We will consider appellant's argument in our independent review of his death sentence.

## D. Weighing and Determination of the Death Penalty

{¶108} In his fifth proposition of law, appellant argues that the death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. We will also consider this argument in our independent review of appellant's death sentence.

IV.  Ineffective Assistance of Counsel

**{¶109}** In his eleventh proposition of law, appellant alleges multiple instances of ineffective assistance of counsel.  Reversal of convictions for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.  Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.  "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."  Id., paragraph three of the syllabus.

A.  Failure to Conduct Voir Dire about Pretrial Publicity

**{¶110}** Appellant complains that his counsel failed to inquire adequately about pretrial publicity during voir dire.

**{¶111}** We have recognized that " '[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.' "  *State v. Cornwell* (1999), 86 Ohio St.3d 560, 568, 715 N.E.2d 1144, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042.  Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent."  *State v. Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765; see, also, *State v. Bradley*, 42 Ohio St.3d at 143-144, 538 N.E.2d 373.

**{¶112}** The trial counsel filed a pretrial motion to conduct sequestered voir dire on pretrial publicity, and this motion was granted.  During voir dire, the trial court asked the first panel of jurors about pretrial publicity, and one prospective juror indicated that she had read a newspaper account about the event.  However,

the trial counsel did not ask any questions about pretrial publicity during voir dire examination.

{¶113} The trial counsel retained flexibility to forgo voir dire on pretrial publicity once the trial had started, and the defense counsel were not locked into this line of questioning solely because of their pretrial motion. We find that counsel were not ineffective, since their action falls "within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, there is no evidence that pretrial publicity affected appellant's case, and any prejudicial impact is purely speculative. Therefore, we reject this claim.

B. Failure to Object to the Prosecutor's Denigration of Reasonable Doubt

{¶114} Appellant argues that his counsel were ineffective for failing to object to the prosecutor's use of a bridge analogy to explain reasonable doubt to the jury and further erred by using the analogy during the defense opening statement. We previously found that the prosecutor committed no misconduct in using the bridge analogy at trial. Moreover, appellant's counsel effectively used the prosecutor's bridge analogy to defense advantage during their opening statement. Under these circumstances, we find that appellant's attorneys made a legitimate tactical decision and were not ineffective. See *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

C. Failure to Again Move to Seal the Prosecutor's File

{¶115} Appellant also asserts that his counsel were ineffective by failing to again move to seal the prosecutor's file. We held in regard to appellant's eighth proposition of law that the trial court committed no error by refusing to seal the prosecutor's file. Moreover, appellant's claim that the prosecution withheld other exculpatory evidence is purely speculative. Thus, this claim has no merit.

D.  Failure to Recall Witnesses or Request a Mistrial

{¶116} Appellant argues that his counsel were ineffective by failing to recall witnesses or request a mistrial after learning that the prosecution withheld evidence about Copas's unconsciousness.  During Ertel's testimony, the defense learned that Officer Hagar's statement showed that Copas was unconscious after the attack.

{¶117} Appellant claims that his counsel should have recalled Copas's physicians and confronted them with Hagar's statement.  Appellant asserts that his counsel could have used evidence of Copas's unconsciousness to show that the doctors' failure to order an immediate CAT scan was gross medical malpractice.  Appellant also asserts that trial counsel could have used Hagar's statement to "create the inference that the physicians were lying about their lack of knowledge of Copas's unconsciousness."

{¶118} However, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749; see, also, *State v. Jackson* (2001), 92 Ohio St.3d 436, 447, 751 N.E.2d 946.  No evidence exists that Hagar informed Dr. Talkers or other treating physicians of Copas's unconsciousness, and thus this information played no role in Copas's medical treatment.  Counsel could legitimately decide not to recall physicians to reiterate that they were unaware of Copas's unconsciousness.  Furthermore, it was also unlikely that trial counsel could have used Hagar's statement to show that Copas's physicians were untruthful.  Thus, we also reject this ineffectiveness claim.

E.  Failure to Develop Inconsistencies During Cross-examination

{¶119} Appellant argues that his counsel were ineffective in their cross-examination of Dr. Katz and Dr. McWeeney, the state's medical experts.

{¶120} This court has recognized that " '[t]rial counsel need not cross-examine every witness * * *. The strategic decision not to cross-examine witnesses

is firmly committed to trial counsel's judgment * * *.' " *State v. Campbell*, 90 Ohio St.3d at 339, 738 N.E.2d 1178, quoting *State v. Otte* (1996), 74 Ohio St.3d 555, 565, 660 N.E.2d 711.

{¶121} First, appellant argues that his counsel were ineffective for failing to bring out inconsistencies in Dr. Katz's testimony about Copas's numbness. On direct examination, Dr. Katz testified that "tingling and numbness in his * * * face" were two of several medical findings that led him to request a CAT scan. Subsequently, however, Dr. Katz mentioned that the absence of any "weakness or tingling or numbness in [Copas's] body" was a reason why the "average ophthalmologist" or "average emergency room physician" might not have ordered a CAT scan.

{¶122} Appellant does not explain how his attorneys' failure to highlight Dr. Katz's inconsistencies made a difference in the outcome of his case. According to Dr. Katz, the absence of numbness was only one of several factors that might explain why an average emergency room doctor did not order a CAT scan. If challenged, Dr. Katz likely would have corrected his misstatement about numbness and clarified his testimony. However, it is unclear whether Dr. Katz's clarification would have worked in appellant's favor.

{¶123} Thus, counsel could decide to forgo further cross-examination to avoid the danger of reinforcing the state's evidence (i.e., numbness as only one factor) and clarifying expert testimony that might not come out in appellant's favor (i.e., numbness as a subtlety that might be overlooked). Moreover, the jurors heard Dr. Katz's testimony, and they could evaluate his inconsistencies during their deliberations. We find that appellant's attorneys made a legitimate "tactical decision" and were not ineffective. *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶124} Second, appellant contends that his counsel were ineffective by failing to cross-examine Dr. McWeeney on the implications of Copas's numbness.

Dr. McWeeney testified that Copas told him on August 23 that "he felt his face was numb at times." Thus, appellant argues that his counsel should have challenged Dr. McWeeney's failure to order a CAT scan in view of Dr. Katz's testimony about numbness of the face.

{¶125} Appellant has not demonstrated how further cross-examination of Dr. McWeeney would have made a difference in his case. In fact, Dr. McWeeney testified that he ordered a CAT scan of Copas's head because of his "traumatic facial injuries." Counsel made a legitimate "tactical decision" on the scope of cross-examination, and we reject this claim.

F. Failure to Call Witness on Conditions of Confinement

{¶126} Appellant complains about his attorneys' failure to present adequate evidence about confinement for life without the possibility of parole or conditions of confinement at the Ohio State penitentiary in Youngstown.

{¶127} During mitigation, Trooper Ertel testified about conditions at the maximum security prison at Youngstown based on his one visit to the prison. Ertel said that inmates were housed individually and confined to their cells for up to twenty-three hours a day. During appellant's unsworn statement, he told jurors, "If I get a life sentence, I will go to a super maximum prison where I will stay isolated from others except contact with guards."

{¶128} Appellant claims that counsel were ineffective for failing to subpoena "someone from Youngstown or the Department of Rehabilitation and Corrections" to testify about conditions of confinement. According to appellant, the jurors were interested in confinement conditions, since during sentence deliberations, they had asked the trial court, "If given a life sentence, how is it assured it will be served in a maximum security prison?" and "How will we be assured he will be in his cell 23 hours a day?"

{¶129} However, "[t]he decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of

counsel." *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47. The defense attorneys were not ineffective in relying on Ertel's testimony about the realities of prison life were appellant sentenced to life without parole. Moreover, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy*, 91 Ohio St.3d at 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶130} Testimony about prison conditions was of questionable relevance, since evidence about future conditions of confinement involves speculation as to what future officials in the penal system will or will not do. Such evidence did not relate to appellant, his background or the nature and circumstances of the crime and therefore is not mitigating. See *State v. White*, 85 Ohio St.3d at 448, 709 N.E.2d 140; see, also, *People v. Thompson* (1988), 45 Cal.3d 86, 139, 246 Cal.Rptr. 245, 753 P.2d 37; *People v. Coddington* (2000), 23 Cal.4th 529, 636, 97 Cal.Rptr.2d 528, 2 P.3d 1081 (conditions of confinement irrelevant to a capital sentencing scheme); *Schmitt v. Commonwealth* (2001), 262 Va. 127, 146, 547 S.E.2d 186 (evidence of prison life and security features of a maximum security prison not admissible); but, c.f., *State v. Rhines* (1996), 1996 S.D. 55, 175, 548 N.W.2d 415 (prison life relevant when weighing alternatives of life imprisonment and the death penalty). Thus, this claim of ineffectiveness has no merit.

G. Failure to Present Adequate Evidence of Child Abuse

{¶131} Appellant also complains about his attorneys' failure to present evidence about his child abuse.

{¶132} Patricia Cutcher, appellant's sister, testified that their mother was a harsh disciplinarian and mentioned that appellant was sexually abused as a child, although she did not elaborate.

{¶133} Similarly, Dr. Burch testified that appellant's mother was a very abusive parent. Dr. Burch also testified that appellant's relationship with his mother was ambivalent, and it seemed that he was "pampered, but also abused later

on." Further, Dr. Burch mentioned "an allegation by one of the sisters that in one of the foster placements she believed that there may have been some sexual abuse."

**{¶134}** Considerable evidence was introduced about parental abuse and neglect for the jury's consideration. The record does not support appellant's speculation that his counsel failed to present other available evidence to the jury about the conditions of his upbringing. Indeed, appellant did not mention any abuse during his unsworn statement. Thus, " '[i]t may be * * * that counsel conducted a diligent investigation, but [were] unable to find [more] substantial mitigation evidence.' " *State v. Otte*, 74 Ohio St.3d at 566, 660 N.E.2d 711, quoting *State v. Hutton* (1990), 53 Ohio St.3d 36, 42, 559 N.E.2d 432. Accordingly, we reject this claim.

H. Failure to Explain the Significance of Appellant's Records

**{¶135}** Appellant argues that his counsel failed to adequately explain the significance of Lucas County Children Services records regarding one of his sister's problems with appellant's mother in 1972 and appellant's juvenile records from the early 1960s.

**{¶136}** Appellant contends that his counsel "merely handed over these records to the jury" and asked them to read through them without providing the jury with any guidance concerning their significance as mitigation. This is incorrect. Dr. Burch's extensive testimony about appellant's childhood in a poor and abusive household referenced information contained in appellant's juvenile and family records. Moreover, these records were not voluminous, and the jurors could readily review this information during their deliberations.

**{¶137}** We find that counsel made a legitimate "tactical" choice in introducing appellant's juvenile and family records without highlighting specific items of information for the jury's consideration. See *State v. Jones*, 91 Ohio St.3d at 356, 744 N.E.2d 1163. Appellant's attorneys were not deficient, and we reject this claim.

### I. Failure to Object to Prosecutorial Misconduct

{¶138} Appellant recasts his objections to prosecutorial misconduct into claims of ineffective assistance of counsel without showing deficient performance or how reasonably probable that, but for his attorneys' errors, the result of the trial would be different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. However, " '[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.' " *State v. Fears* (1999), 86 Ohio St.3d 329, 347, 715 N.E.2d 136, quoting *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831; see, also, *State v. Hartman* (2001), 93 Ohio St.3d 274, 300, 754 N.E.2d 1150. Since appellant does not show that any particular failure to object substantially violated any essential duty or was otherwise prejudicial, we reject this claim.

### J. Failure to Object to Instructions

{¶139} Appellant also complains that his counsel were ineffective by failing to object to two of the trial court's instructions.

{¶140} First, appellant argues that his counsel should have objected to the trial court's instructions on reasonable doubt. Earlier in this opinion, we found no error in the court's instructions on reasonable doubt. Thus, appellant's attorneys were not ineffective, and this claim lacks merit.

{¶141} Second, appellant claims that counsel erred by failing to object to the following instructions about his unsworn statement: "Now, Mr. Hanna will take the stand in the mitigation presentation, but will not testify under oath and, therefore, cross examination is not permitted. It is his right under Ohio law to do so and the exercising of that right may not be considered by you to impair in any way the value of what he tells you."

{¶142} The trial court's instructions on unsworn statements did not prejudice appellant. See *State v. Grant* (1993), 67 Ohio St.3d 465, 478, 620 N.E.2d 50; see, also, *State v. Davis* (1996), 76 Ohio St.3d 107, 120, 666 N.E.2d 1099; *State*

*v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph two of the syllabus. Thus, appellant's attorneys were not deficient by failing to object, and we reject this claim.

{¶143} In summary, since none of appellant's claims establishes ineffective assistance of counsel, we find that his eleventh proposition lacks merit.

## V. Constitutional Issues

{¶144} In his fifteenth proposition of law, appellant disputes the constitutionality of Ohio's death penalty statute. We reject these claims and so reject appellant's fifteenth proposition. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 179, 15 OBR 311, 473 N.E.2d 264.

## VI. Cumulative Error

{¶145} In his thirteenth proposition of law, appellant argues that the cumulative effect of errors in this case necessitates reversal of his conviction and death sentence. However, we find that appellant received a fair trial and a fair sentencing determination, and no significant cumulative error occurred. Therefore, we reject appellant's thirteenth proposition.

## VII. Independent Sentence Evaluation

### A. Aggravating Circumstances

{¶146} The evidence established that appellant was properly convicted of aggravated murder with prior calculation and design with death penalty specifications for murder while a prisoner in a detention facility under R.C. 2929.04(A)(4) and for a prior purposeful killing under R.C. 2929.04(A)(5).

B. Mitigation Evidence

**{¶147}** Appellant called three mitigation witnesses, provided his own unsworn statement to the jury, and submitted documentary evidence for the jury's consideration.

**{¶148}** Patricia Cutcher, appellant's sister, testified about appellant's upbringing. According to Cutcher, her appearance at the trial provided her with the first opportunity to see appellant in twenty-one years. Cutcher was the youngest of nine children (seven sisters and two brothers) in the Hanna family. The family lived in a "little house" in Toledo, Ohio, that had no indoor plumbing.

**{¶149}** Appellant's mother raised the family after their father died. Their mother did not work and supported the family on Social Security benefits received after their father died in 1956. Only two of the nine children graduated from high school. Appellant's mother was a harsh disciplinarian. She would use a shoe, the hard part of a vacuum hose, and willow switches to discipline her children. Appellant was described as her mother's favorite child. Appellant's mother was "slack with him" in enforcing rules. However, appellant got into trouble with "theft and stuff like that" because of a lack of supervision at home.

**{¶150}** According to Cutcher, appellant was sexually abused as a child, although she provided no details. Finally, Cutcher mentioned that appellant was placed in foster homes "more than twice" when he was growing up.

**{¶151}** Dr. Kathleen Burch, a clinical psychologist, conducted psychological testing of appellant, reviewed appellant's records, and talked to his mother and three of his sisters. According to Dr. Burch, appellant's clinical history showed that he was raised in a very dysfunctional family. Appellant's family was "extremely poor, to the point of living in an Army surplus tent for several years."

**{¶152}** Appellant's father died when appellant was six years old. Thereafter, appellant's mother raised the family on her own. She was "rather aggressive and abusive toward the children." Appellant was his mother's favorite

child, and "he was allowed to pull the girls' hair and be mean to them and not get punished for it." Meanwhile, his sisters were frequently punished, and on one occasion, "the mother broke the sister's nose because she made [appellant] get angry. So it was very, very inconsistent and also humiliating, * * * for both the daughters and James." In sum, his mother "overprotected him in the sense of not allowing him to accept responsibility or to be made * * * responsible for any of his behaviors, but also treated him in a humiliating and overly controlling fashion."

{¶153} Appellant told Dr. Burch that he had killed Copas because he "had been very careless and left the cell open when James was at work. And when this guy left, he would leave the cell open and that a number of James' personal belongings were stolen." According to appellant, Copas also "enlisted the support of some of his friends and that threats were made against James." On the night of the stabbing, Copas "came back to the cell late and he was drunk and he was loud and noisy and James was trying to sleep and could not sleep because of this guy's disruption." Appellant then stabbed Copas in the eye and beat him when he stirred around.

{¶154} Family members told Dr. Burch that a neighbor had sexually abused appellant. One of appellant's sisters stated "that in one of the foster placements she believed that there may have been some sexual abuse." However, Dr. Burch was not able to substantiate this abuse.

{¶155} According to Dr. Burch, "[t]here were a lot of efforts to treat [appellant]," beginning at about age 12 when he was admitted to the Child Study Institute. "And then there were a couple of foster placements in between those admissions. And then he was involved in Ohio Youth Services and several placements."

{¶156} Neuropsychological testing showed that appellant has attention deficit disorder, which was never diagnosed or treated, frontal lobe impairment in the brain, and dysfunction in the right posterior aspect of his brain. Appellant was

also diagnosed with a "personality disorder, predominantly antisocial, and he has a passive/aggressive style and also hostile/dependent style of relating." According to Dr. Burch, appellant is "not a person who functions very well. He had a lifelong history of poor performance in most areas. He's not ever really showed the ability to look ahead, to behave in his best interests, to delay gratification toward a future goal, to regulate his feelings and his behavior in a way that allows healthy, productive, effective relationships with other people."

{¶157} Dr. Burch stated that appellant's imprisonment in a maximum security prison, where there was virtually no contact with other inmates, would likely cause his mental health to go more "off the beam." However, "[i]t would be safer for him and, from that aspect, for other people."

{¶158} During cross-examination, Dr. Burch stated that appellant's intelligence quotient (IQ) was in the normal range, between 91 and 111. There was also no information that any of appellant's brothers or sisters went to adult prison for violent crimes.

{¶159} Trooper Ertel described the conditions of imprisonment at the maximum security prison at Youngstown based upon his one visit to that facility. Ertel stated that prisoners were housed individually in cells for up to twenty-three hours a day. During cross-examination, Ertel stated that prisoners at Lucasville were housed in single cells and that prison guards escorted prisoners everywhere.

{¶160} In his unsworn statement, appellant expressed "deepfelt regret and remorse and, yes, also sorrow that I have in turn inflicted upon Peter Copas and others innocent of any type of wrongdoing." Appellant also said, "Considering the type of isolation and incarceration that I exist under these days, weeks, months, and years, I foresee no human contact other than corrections officers and officials, with most of that being strictly limited to visual contact alone. My confinement consists of a steel cement bed, mattress with bedding, light fixture, toilet and sink

combination, but without a window for fresh air, just the vent circulated variety inside my cell."

{¶161} Appellant added, "I wanted an offer to plead guilty to aggravated murder and receive a sentence of life in prison without parole. This would have saved a trial. * * * [T]he prosecutor told my lawyers they would not agree." If he received a life sentence, appellant said, "I will go to a super maximum prison where I will stay isolated from others except contact with guards." In concluding remarks, appellant said, "I again express my remorse and thanks (sic) you for listening to my statement."

{¶162} Lucas County Juvenile Court records from 1962 through 1966 showed that appellant was a runaway, charged with being ungovernable, unsuccessfully placed in foster care, and later placed in various juvenile institutions. A probation counselor's report dated September 21, 1962, described appellant's mother's hardship as a single parent raising a large family with few financial resources, appellant's inability to get along with his mother, and the family's inadequate living conditions.

{¶163} Records from 1963 showed that appellant was unable to adjust to foster care. A psychologist's report dated November 15, 1963, stated that appellant was "disturbed emotionally and that institutional placement where he will receive psychiatric counseling and training in accepting rules, regulations and limits" was considered the preferred treatment approach. Appellant was committed to the Youth Commission and transferred to the Boys' Industrial School on December 27, 1963. Records from 1964 through 1966 showed truancy infractions, parole violations for disorderly conduct and theft, and parole violations for burglary and larceny. In 1966, appellant escaped from the Fairfield School for Boys four times, but he was apprehended and returned to the school on each occasion.

{¶164} Lucas County children's records from 1972 pertaining to appellant's sister Patricia discussed the family's living situation and illustrated Mrs.

Hanna's lack of concern for her children's home placement. Mrs. Hanna was described as a "dramatic woman with a loud, almost piercing voice."

C. Sentence Evaluation

**{¶165}** We find that the evidence proves beyond a reasonable doubt that appellant was guilty of the charged aggravating circumstances, i.e., murder while a prisoner in a detention facility, R.C. 2929.04(A)(4), and a prior purposeful killing under R.C. 2929.04(A)(5).

**{¶166}** We find nothing in the nature and circumstances of this offense to be mitigating. Appellant fashioned the sharpened end of a paintbrush into a deadly weapon, thrust it into Copas's right eye socket while he was sleeping, and then broke off the paintbrush handle, leaving five inches of it lodged inside Copas's brain. Appellant then continued the attack by hitting Copas about the head with a padlock in a sock. Later, appellant bragged about killing this "maggot baby-raper-killer," making him suffer by stabbing "one of his eyeballs up out of its socket," and then beating on "his stupid-ass-head off-and-on for two (2) hours." Thus, the facts show a senseless, horrific murder that lacks any mitigating features.

**{¶167}** Appellant's history and background provide some mitigating features. Appellant grew up as one of nine children in a dysfunctional family. Appellant's father died when he was young, and he was raised by an abusive, overly controlling mother. His teenage years were turbulent as he was removed from his home, placed in foster care, and later spent time in various juvenile institutions. Appellant's character offers no redeeming features.

**{¶168}** We conclude that, pursuant to R.C. 2929.04(B)(7), these facts are applicable but entitled to little weight. Dr. Burch testified that appellant has attention deficit disorder, antisocial personality disorder, and suffers from some organic injury to his brain. However, psychological and mental disorders do not mitigate the aggravating circumstances of this crime. See *State v. Stojetz*, 84 Ohio

St.3d at 472, 705 N.E.2d 329 (paranoid schizoid personality and post-traumatic stress disorder entitled to only modest weight under [B][7]).

{¶169} Other factors in mitigation include appellant's unsworn statement. Appellant expressed remorse for killing Copas. Appellant's remorse represented a sharp contrast to his sentiments about the murder in his letter to Borowski in January 1998. Then, he boasted about killing Copas. Thus, we attach little weight to appellant's expression of remorse during his unsworn statement. See *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246 (retrospective remorse entitled to little weight in mitigation).

{¶170} Appellant's unsworn statement also mentioned that he offered to plead guilty as charged if allowed to accept a sentence of life without parole. However, appellant had been in prison since 1978 for aggravated murder and attempted aggravated murder. Thus, given his status at the time of the offense, we agree with the trial court that appellant's "offer to plea was conceding little regardless of the outcome of the offense." We find that appellant's offer to plea is entitled to little weight in mitigation.

{¶171} In summary, appellant's collective mitigation is weak. His family background, psychological disorders, and his unsworn statement are entitled to modest weight in mitigation. Overall, the mitigating factors are of minimal significance, and the aggravating circumstances substantially outweigh them.

{¶172} We find that appellant's death sentence is proportionate to death sentences approved for murders by inmates in detention facilities, see *State v. Stojetz*, 84 Ohio St.3d at 472, 705 N.E.2d 329; *State v. Bradley*, 42 Ohio St.3d at 149, 538 N.E.2d 373; *State v. Zuern*, 32 Ohio St.3d 56, 512 N.E.2d 585, and for offenders with prior murder convictions, see *State v. Taylor*, 78 Ohio St.3d at 34, 676 N.E.2d 82; *State v. Carter*, 64 Ohio St.3d at 228, 594 N.E.2d 595; *State v. Mapes* (1985), 19 Ohio St.3d 108, 118, 19 OBR 318, 484 N.E.2d 140.

**{¶173}** For the foregoing reasons, we affirm appellant's convictions and death sentence.

Judgment affirmed.

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

Timothy A. Oliver, Warren County Prosecuting Attorney, Kenneth A. Ewing and James D. Beaton, Assistant Prosecuting Attorneys, for appellee.

David H. Bodiker, Ohio Public Defender, Stephen A Ferrell, Kelly L. Culshaw and Diane M. Menashe, Assistant Public Defenders, for appellant.

_____