[Cite as *State v. Crockett*, 2016-Ohio-7572.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | Nos. 15AP-1149 (C.P.C. No. 13CR-1660) |
| v. | : | and 15AP-1152 (C.P.C. No. 12CR-1185) |
| Johnnie Crockett, III, | : | |
| Defendant-Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on November 1, 2016

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Barbara A. Farnbacher,* for appellee.

**On brief:** *Johnnie Crockett, III,* pro se.

APPEAL from the Franklin County Court of Common Pleas

HORTON, J.

{¶ 1} Defendant-appellant, Johnnie Crockett, III, appeals the December 4, 2015 judgment of the Franklin County Court of Common Pleas denying his motion for a new trial as it does not contain newly discovered evidence. Further, the trial court rejected appellant's claim of ineffective assistance of counsel as it is barred by the doctrine of res judicata. For the reasons that follow, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This is appellant's second appeal with respect to these cases. On March 6, 2012, the Franklin County Grand Jury issued a three-count indictment charging appellant with felonious assault and two counts of endangering children. (*See* case No. 15AP-1152.) On March 26, 2013, the Franklin County Grand Jury issued a second indictment charging appellant with murder. (*See* case No. 15AP-1149.) On February 4, 2014, a jury returned a verdict of guilty on two counts of endangering children, each a

felony of the second degree and one count of murder, an unclassified felony. The jury also returned a verdict of not guilty of one count of felonious assault.

{¶ 3} On February 26, 2014, a sentencing hearing was held. The trial court imposed a life sentence with possibility of parole after 15 years for the conviction of murder. The trial court also imposed a sentence of 3 years for Count 2 of the indictment of endangering children to run concurrent with 18 months as to Count 3 of the indictment of endangering children. Each term runs concurrent with the murder sentence.

{¶ 4} On June 11, 2015, this court rejected appellant's claims and affirmed his conviction. On October 7, 2015, appellant filed a motion for leave to file a delayed motion for new trial accompanied by a motion for new trial. As noted above, the trial court denied appellant's motion for new trial on December 4, 2015. Appellant filed an appeal to the Supreme Court of Ohio, which denied jurisdiction. *State v. Crockett*, 144 Ohio St.3d 1428, 2015-Ohio-5225.

{¶ 5} This court relies on the recitation of facts set forth in its June 11, 2015 decision:

> On February 12, 2012, Whitehall Police Officer Jerry Dillon responded to a report that an eight-month-old child was not breathing. As he approached the reported location of the incident, a woman waved at him and then ran inside an apartment. Officer Dillon ran after the woman into the apartment, in which he found a man, later identified as appellant, kneeling over a child who was wearing only a diaper, had vomit coming out of the right side of his mouth, and appeared to be "lifeless." (Tr. 39.) Upon noticing that the child was not breathing and did not have a pulse, Officer Dillon began performing chest compressions while simultaneously alerting medical personnel to the situation. A firefighter responded to Officer Dillon's report and told him to bring the child outside, as a medic was arriving on the scene. Officer Dillon ran outside and delivered the child to the medics.
>
> Whitehall Police Officer Anthony Fields also responded to the incident on February 12, 2012, arriving seconds after Officer Dillon. After Officer Dillon ran out of the house and delivered the child to the medics, Officer Fields remained at the apartment, where he spoke with the child's father, whom he identified as appellant. According to Officer Fields, appellant stated that the child's mother left the child in appellant's sole care while she left the apartment to go to the store. Appellant placed the child in a playpen and covered him with a blanket.

Appellant later checked on the child, whereupon he noticed that the child was not breathing. Appellant took the child out of the playpen, removed the child's clothes, splashed water on the child's face, and began blowing in his mouth in an attempt to resuscitate him while he contacted the mother by phone. Appellant stated that the child had no prior health problems. Upon examining the apartment, Officer Fields noticed what appeared to be vomit in the bathroom sink.

Doug Neighbarger, a paramedic and firefighter employed by the City of Whitehall Division of Fire, also responded to the report of a child having difficulty breathing on February 12, 2012. Within two minutes of being dispatched, he arrived at the scene, received the child, whom he identified as I.C., outside from a police officer, and proceeded to the hospital. En route to the hospital, Neighbarger and three other paramedics, who were in the back of the ambulance with I.C., began working to revive him. I.C. did not have a heartbeat and was not breathing but had no noticeable external injuries. Neighbarger noted that he had a dirty diaper and vomit on his face. The paramedics were able to restore I.C.'s heartbeat through CPR and delivered him to the emergency room at Nationwide Children's Hospital approximately 30 minutes after being dispatched.

Dr. David Rogers, a pediatric ophthalmologist at Nationwide Children's Hospital, examined I.C. on February 12, 2012 around 7:30 p.m., and identified 15 to 20 retinal hemorrhages in the back of the left eye and 1 retinal hemorrhage in the back of the right eye. Dr. Rogers testified that "retinal hemorrhages can happen in all kinds of situations and diseases" but that "their location * * * both within the retina and throughout the eye can be very diagnostic of what actually caused them." (Tr. 133-34.) He indicated that I.C.'s injuries were similar to those found in patients who had been in a fatal single impact motor vehicle accident or had fallen from a multiple story building but that the injuries were inconsistent with a short fall, such as from a bed or couch. Because the hemorrhages were located around the optic nerve and along the blood vessels, and there was no other sign of physical trauma to the eye, Dr. Rogers found that abusive head trauma was a potential cause of I.C.'s injury. Based upon I.C.'s history and the lack of other potential causes for the specific injury to I.C.'s eyes, Dr. Rogers concluded that the injury resulted from abusive head trauma.

Dr. Rogers stated that "[t]here is absolutely no indication from this eye exam that I performed and which is documented

photographically there is any possibility that this could be related to increased pressure in [I.C.'s] brain." (Tr. 141.) Dr. Rogers stated that the number, type, and location of the hemorrhages in I.C.'s eyes were inconsistent with an increase in intracranial pressure. Dr. Rogers sought further testing to determine whether I.C. had a bleeding disorder and noted that, if bleeding disorders were not found, then nonaccidental trauma should be considered as a potential cause of I.C.'s injuries. However, Dr. Rogers stated that the types of hemorrhages in I.C.'s eyes were not consistent with a bleeding disorder. Dr. Rogers also stated that he had seen retinal hemorrhages caused by CPR but that the hemorrhages found in I.C.'s eyes were inconsistent with those caused by CPR based upon studies of CPR performed by trained professionals and first responders in the community.

On February 14, 2012, Dr. Lisa Martin, a pediatric radiologist at Nationwide Children's Hospital, examined an MRI of I.C.'s cervical spine, which is the area from the bottom of the skull to the shoulders, and I.C.'s thoracic spine, which is located near the chest of the patient. Dr. Martin found abnormal fluid in the cervical spine, which indicated a ligament injury. Dr. Martin indicated that this injury resulted from "significant force," such as in a motor vehicle accident or a similar whiplash-inducing event, or in the event of a fall from a third-story window or a tall tree. She also found relatively acute or recent compression fractures in I.C.'s seventh and ninth thoracic vertebrae, which are located approximately in the middle of the back. Dr. Martin stated that I.C.'s injuries could not have occurred while he was laying flat on his back, as would normally be the case if someone was performing CPR on him. Dr. Martin testified that I.C.'s injuries were consistent with either accidental or nonaccidental trauma but that she could not infer more based upon the radiological exam.

On February 12, 2012, Dr. Brent Adler, a pediatric radiologist at Nationwide Children's Hospital, reviewed a portable chest x-ray of I.C. which was completed in the emergency department shortly after he arrived at the hospital. Based upon the initial chest x-ray, Dr. Adler was unable to find any problems with I.C.'s lungs and did not observe any fractures at the time. Next, Dr. Adler reviewed a lateral cervical spine film to ascertain whether the bones in the neck were properly aligned and found no abnormalities. Dr. Adler then reviewed a CT scan of I.C.'s head and found acute hemorrhages in the subdural area of the brain that had begun "within the last couple of days." (Tr. 269.) Dr. Adler stated that the kind of "relatively forceful bleeding" he observed in I.C.'s case

reflected "some sort of trauma that caused tearing of the veins around the brain," resulting from events such as "car accidents, falls from great heights, nonaccidental trauma, or child abuse," or that it could happen if a person had a "propensity to bleeding." (Tr. 270-73.) Also, on February 12, 2012, Dr. Adler reviewed an abdominal CT scan performed on I.C. and found a three and one-half centimeter laceration of the liver and a pattern that suggested shock bowel. Dr. Adler stated that he had read about instances where liver lacerations resulted from CPR, but he had never seen it happen.

On February 13, 2012, Dr. Adler conducted a skeletal survey on I.C. and found no fractures. On February 14, 2012, Dr. Adler reviewed the skeletal survey again and, based upon Dr. Martin's review of I.C.'s MRI, identified fractures of I.C.'s spine that he had initially not seen. Dr. Adler concluded that I.C.'s fractures were consistent with the bleeding he observed in I.C.'s brain and that such injuries could result from a large amount of force that flexed the body forward. On March 15, 2012, Dr. Adler reviewed another CT scan of I.C.'s head and observed extra fluid outside of the brain which indicated that the brain was shrinking as cells in the brain died. Dr. Adler indicated that the evolution of the injury to I.C.'s brain suggested that, "because the brain looked so normal on the initial study, * * * the injury must have been shortly before the initial study" on February 12, 2012. (Tr. 328.)

Dr. Nicholas Zumberge, a pediatric radiologist at Nationwide Children's hospital, performed the first MRI of I.C.'s brain on February 13, 2012, which showed swelling and cell death occurring in the brain. Based upon the increase in the amount of fluid around the periphery of the brain between the time of the initial head CT scan taken on February 12, 2012 and the MRI on February 13, 2012, Dr. Zumberge concluded that the injury likely occurred within hours or a day of the initial CT scan. Dr. Zumberge also stated that a hypoxic ischemic injury, namely an injury involving cell death resulting from a lack of oxygen, was not consistent with the subdural hemorrhages found in I.C.'s brain.

Based upon I.C.'s medical history, Dr. Zumberge concluded that it was "difficult to explain or nearly impossible to explain" I.C.'s injuries, specifically "retinal hemorrhages, subdural hemorrhages, and diffuse brain injury," in any manner other than "child abuse or nonaccidental trauma or abusive head injury, whatever term is used." (Tr. 432.) Dr. Zumberge also pointed to the liver laceration, shocky appearance of the bowel, compression fractures of the seventh and ninth

thoracic vertebrae, and edema in the ligaments of the upper neck as evidence raising a suspicion of child abuse. Dr. Zumberge conceded that, although "there's a chance that this wasn't abusive injury or a traumatic injury, * * * when it comes to the [injury to the] neck, I don't know what else this could be." (Tr. 438.) Dr. Zumberge asserted that I.C.'s injuries were "the result of significant trauma with a pattern that is very suggestive of abuse, and a trauma that is not compatible with trauma that would occur during aggressive or vigorous resuscitative effort." (Tr. 441.)

Dr. Bhuvana Setty, a pediatric hematologist and oncologist at Nationwide Children's hospital, reviewed I.C.'s lab results and determined that he did not have an underlying bleeding disorder.

On February 12, 2012, Detective Steve Brown of the Whitehall Police Department interviewed I.C.'s parents at Nationwide Children's Hospital. I.C.'s father, whom Detective Brown identified as appellant, stated that I.C. fell from a bed about three days before February 12, 2012. Detective Brown later examined the bed that appellant claimed I.C. fell from and found that the bed was 18 inches from the floor, which was carpeted. According to Detective Brown, appellant claimed that I.C. was in good health with no apparent problems before the morning of February 12, 2012, when he stopped breathing. Appellant stated that he took I.C. out of bed that morning and that no one else had contact with I.C. until after he stopped breathing. After I.C. stopped breathing, appellant called I.C.'s mother, who was away from the home at a store. When she returned home from the store, I.C.'s mother called 911.

Dr. Mary Ranee Leder, attending physician in the Child Advocacy Center at Nationwide Children's Hospital, whose duties included assessing children in response to reports of potential sexual assault or child abuse, was responsible for examining I.C.'s case in this capacity. After beginning an examination of I.C.'s case, she was able to obtain a timeline of I.C.'s condition through speaking with his parents. According to Dr. Leder, both parents affirmed that I.C. was well the night before being admitted to the hospital and that, when I.C. awoke at 11:00 a.m. on February 12, 2012, appellant removed him from bed and placed him on his abdomen in bed while appellant played video games. At that time, I.C.'s mother observed that he appeared well, and then she departed the home to go to a store. After some period of time, appellant checked on I.C., at which point he noticed that he was not

breathing. Appellant stated that he splashed water on the child and attempted resuscitation by beating on the child's chest with a closed fist, which he demonstrated for Dr. Leder. When the child did not respond, appellant called I.C.'s mother, who left the store, arrived home, and then called 911 for help.

Dr. Leder stated that I.C.'s injuries were inconsistent with a fall from a bed at a height of 18 inches onto a carpeted floor, as described by I.C.'s parents. Dr. Leder conducted a physical exam of I.C. and noted only minor external injuries. On February 13, 2012, Dr. Leder observed a subdural hemorrhage on the right side of I.C.'s brain and a three-centimeter liver laceration in her review of I.C.'s head CT scan, abdomen and pelvis CT scan, and skeletal survey, which she performed in conjunction with a pediatric radiologist. Dr. Leder stated that bleeding on the surface of the brain, like what she observed in I.C.'s case, could be caused by "repetitive acceleration/deceleration of the type seen with shaking, with or without impact," and that such shaking would be "vigorous shaking of the type where a reasonable caregiver observing it would say that this is an inappropriate way of handling an infant." (Tr. 623-24.) Dr. Leder stated that the ligament injury in I.C.'s neck and the compression fractures in the seventh and ninth thoracic vertebrae could be caused by repetitive acceleration and deceleration or vigorous shaking. Dr. Leder also discussed the intra-retinal hemorrhages in I.C.'s eyes with Dr. Rogers, who concluded that, having ruled out an underlying bleeding disorder, I.C.'s intra-retinal hemorrhages were consistent with nonaccidental trauma.

Based upon her review of I.C.'s condition, his history, and her discussions with other physicians, Dr. Leder concluded that "the subdural hemorrhages, the retinal hemorrhages, and the vertebral fractures were unexplained" and that "[t]here was no medical condition" or "accidental history that would be explaining [the] presence of these findings" and, therefore, "these findings were consistent with nonaccidental trauma." (Tr. 643.) Dr. Leder stated that the trauma and injury to the brain resulted in difficulties with breathing and the subsequent lack of oxygen to vital organs, rather than a lack of breathing causing the injuries. She stated that her findings allowed for "the possibility, however remote, that the liver laceration could have been caused by [appellant's] reported resuscitative efforts." (Tr. 621.)

Dr. Charles J. Lee, a deputy coroner and forensic pathologist at the Licking County Coroner's Office, performed an autopsy

on I.C. after he died on December 14, 2012 while at a nursing facility specifically for children. Prior to death, I.C. was in a coma with no voluntary movement for several months. Dr. Lee testified that I.C. was a normal weight and length for his age of 18 months at the time he died and that there were no apparent external injuries. Upon undertaking an internal examination, Dr. Lee found that I.C.'s feeding tube had become dislodged from his stomach and that fluid was leaking into his abdominal cavity. Dr. Lee testified that I.C. died as a result of irritation resulting from the fluid in his abdominal cavity and peritonitis, which he defined as "inflammation of the bowel as well as the irritation of the heart causing it to rapidly beat and then misbeat and beat irregularly and then not beat at all." (Tr. 703.) He concluded that I.C.'s cause of death was "complications of the peritonitis because of the fluid that was leaking into his belly secondary to him being in a chronic comatose state secondary to the head trauma" and that the manner of death was homicide.

Dr. Lee testified that, although I.C. was otherwise in very good health, his brain was small compared to the size of his skull, and that it weighed about one-third of a normal healthy brain for an average, healthy 18-month-old male. Because I.C.'s brain was about the size of a newborn's brain and much smaller than his skull, Dr. Lee concluded that I.C.'s brain regressed or shrank as a result of injury and death to the tissue. Dr. Lee found I.C.'s injuries to be consistent with abusive head trauma and a lack of oxygen from a significant global trauma affecting the entire brain at once. Dr. Lee found that there were no skull fractures present in I.C.'s case, but there was evidence of a subdural hemorrhage. Dr. Lee stated that bleeding in the brain was inconsistent with a sudden cessation of breathing unless there was trauma to the brain. Further, he stated that the injuries found in I.C.'s brain were inconsistent with sudden infant death syndrome ("SIDS") or short falls.

At trial, appellant called Dr. Thomas W. Young, a forensic pathologist in private practice, to testify. Dr. Young formerly served as a medical examiner for the state of Georgia, and then as the Chief Medical Examiner for the counties of Jackson, Platte, Clay, and Cass in the state of Missouri. Dr. Young reviewed I.C.'s records and testified that, when the flow of oxygen is restored to the brain after a period of deprivation, the brain will become swollen and that blood vessels will leak resulting in subdural hemorrhages. He also stated that swelling in the brain can increase pressure in the veins in the backs of the eyes, causing retinal hemorrhages. Dr. Young

further stated that performing CPR on an infant can result in a liver laceration.

Dr. Young stated that I.C.'s condition was consistent with a condition called an apparent life-threatening event, which he defined as an instance where a child suddenly stops breathing, similar to SIDS, but is resuscitated. Dr. Young disagreed that abusive trauma in the form of shaking could cause the types of injuries found in I.C.'s case, including ligament injury and vertebral fractures.

*State v. Crockett, III,* 10th Dist. No. 14AP-242, 2015-Ohio-2351, ¶ 2-20.

## II. ASSIGNMENTS OF ERROR

{¶ 6} Appellant appeals assigning the following five errors for our review:

[I.] The trial court abused its discretion and erred in denying appellants motion for leave to file delayed motion for new trial, Thus denying appellant due process guaranteed by the Ohio and United States Constitutions.

[II.] Because appellant supported his new trial motion with evidence demonstrating substantive grounds for relief, the common Pleas court, in deciding appellants new trial motion without an evidentiary hearing, abused its discretion, Thus denying appellant due process guaranteed by the Ohio and United States Constitutions.

[III.] Appellant is entitled to a fair trial and to be tried without the newly discovered evidence of Nationwide Childrens Hospitals complete medical records and the Nursing Home complete medical records of I.C. is a denial of fundamental fairness and other rights as guaranteed by the United States Constitution.

[IV.] Trial court abused it's discretion and erred when it ruled appellants claim of ineffective assistance of trial counsels falure to investagate appellants case was barred by the doctrine of res judicata which denying appellants due process guaranteed by the Ohio and United States Constitutions.

[V.] Trial court abused it's discretion and erred in never entering judgement if appellant was unavoidably prevented from discovering Nationwide Childrens Hospitals complete medical records of I.C. which denying appellant due process guaranteed by the Ohio and United States Constitutions.

(Sic passim.)

## III. TRIAL COURT PROPERLY DENIED THE MOTION

{¶ 7} This court, like the trial court, also finds appellant's appeal and underlying motion for a new trial based on newly discovered evidence difficult to understand. Consequently, we will address appellant's assignments of error one, two, three and five together, and four separately.

{¶ 8} Rule 33(A) of the Ohio Rules of Criminal Procedure governs motions for new trial in criminal proceedings. Crim.R. 33(A) provides the grounds upon which a defendant may receive a new trial. As relevant here, Crim.R. 33(A)(6) provides that a defendant may be granted a new trial "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." Regarding the timing of a motion for new trial based on newly discovered evidence, the rule states as follows:

> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Crim.R. 33(B). *See also State v. Walden*, 19 Ohio App.3d 141 (10th Dist.1984).

{¶ 9} Thus, if a defendant fails to file a motion for a new trial based on newly discovered evidence within 120 days of the jury's verdict or the court's decision, he or she must seek leave from the trial court to file a delayed motion. To obtain such leave, the defendant must demonstrate by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence within the 120 days. *See Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus (holding that clear and convincing evidence is evidence which "will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."). A party is "unavoidably prevented" from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable diligence. *See State v. Lee,* 10th Dist. No. 05AP-229, 2005-Ohio-6374, ¶ 7; *State v. Carr,*

10th Dist. No. 02AP-1240, 2003-Ohio-2947, ¶ 11. *See also State v. Petro*, 148 Ohio St. 505 (1947), syllabus (setting forth a six-part test for determining whether a motion for new trial on the basis of newly discovered evidence should be granted, and holding that the new evidence must "not merely impeach or contradict the former evidence.").

{¶ 10} "We will not disturb a trial court's decision granting or denying a Crim.R. 33 motion for new trial absent an abuse of discretion." *State v. Townsend*, 10th Dist. No. 08AP-371, 2008-Ohio-6518, ¶ 8, citing *State v. Schiebel*, 55 Ohio St.3d 71, 76 (1990). "The abuse of discretion standard of review also applies to Crim.R. 33(B) motions for leave to file a delayed motion for new trial." *Id.* at ¶ 8. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 11} Here, appellant failed to file his motion for new trial based upon newly discovered evidence within 120 days after the verdict. Appellant filed his motion for leave and motion for new trial more than 20 months after the verdicts. Given the clear and convincing standard of proof, appellant was required to provide evidence that would induce the firm belief or conviction that he was "unavoidably prevented." *Schiebel* at 74.

{¶ 12} Appellant's claim, that he did not proximately cause the victim's death, and that it was purportedly caused by medical providers at either the nursing facility and/or the hospital, is similar to the defense he presented at trial, which the jury rejected. Thus, there can be no serious dispute that the defense was aware of the victim's residence in a nursing facility after departing the hospital. There was evidence presented at trial regarding the cause of the victim's death. The hospital's medical records were provided during discovery and admitted into evidence. Knowledge of the victim's death at the nursing facility was available to appellant. (*See* Tr. at 22, 29-33; 692-93, 723, 724, 726; State's Ex. D1-2, E1-7, G.)

{¶ 13} The newly discovered evidence upon which appellant relies is the medical records from the nursing facility. The record does not support appellant's claim that these records were not available. Dr. Charles J. Lee, deputy coroner and forensic pathologist at the Licking County Coroner's Office, testified at trial that he performed an autopsy on the child after he died on December 14, 2012 while at a nursing facility.

{¶ 14} Appellant's motion also fails because he essentially concedes his knowledge of the victim's nursing facility location by attaching an unidentified item titled "Prodgeny

Timeline Records," which noted that the victim's mother visited the victim at the facility. Thus, it is not abuse of discretion for the trial court to believe that the defense was aware of the victim's residence in a nursing facility.

{¶ 15} Appellant knew or easily could have learned of all the information supporting his current claim. He failed to demonstrate that he was unavoidably prevented from discovering the evidence. The trial court correctly concluded that "the evidence upon which the Defendant relie[d] upon for his motion for a new trial [was] not newly discovered." (Dec. 4, 2015 Decision at 3.) That decision should be affirmed.

{¶ 16} Additionally, appellant failed to show that he filed his motion for leave within a reasonable time after discovering the evidence relied upon to support the motion for new trial. *State v. Woodward*, 10th Dist. No. 08AP-1015, 2009-Ohio-4213, ¶ 14. While appellant's affidavit provides how he came to learn about the information for which he relied, appellant nonetheless failed to demonstrate that he had no knowledge of the existence of the ground and could not have learned of its existence. In short, appellant's affidavit provides insufficient explanation as to how he was unavoidably prevented from timely discovering evidence that he could have learned prior to or during trial.

{¶ 17} A " 'trial court may require a defendant to file his motion for leave to file within a reasonable time after he discovers the evidence.' " *State v. Berry*, 10th Dist. No. 06AP-803, 2007-Ohio-2244, ¶ 37, quoting *State v. Griffith*, 11th Dist. No. 2005-T-0038, 2006-Ohio-2935, ¶ 15. Thus, even if a defendant has established that they were unavoidably prevented from filing their motion for a new trial within the time limits, if there was an "undue delay in filing the motion after the evidence was discovered, the trial court must determine if that delay was reasonable under the circumstances or that the defendant has adequately explained the reason for the delay." *State v. Stansberry*, 8th Dist. No. 71004 (Oct. 9, 1997). *See also State v. York*, 2d Dist. No. 2000 CA 70 (Apr. 6, 2001).

{¶ 18} Consequently, appellant's 20-month delay in filing his motions, raising claims that he knew or could have known of before and during his trial, demonstrates his failure to act with reasonable diligence in presenting this information to the trial court, which may have permitted him to file an untimely motion for new trial. *See Woodward* at ¶ 15-17 (two-year delay from knowledge to filing unreasonable). *See also Berry* at ¶ 39-40 (five-year delay from availability of evidence unreasonable). The trial court did not abuse

it's discretion in finding that the evidence upon which appellant relied for his motion for a new trial was not newly discovered. Finally, appellant's failure to obtain leave by the trial court to file his motion for a new trial precludes his ability to prevail in this matter. *State v. Lordi*, 149 Ohio App.3d 627, 2002-Ohio-5517, ¶ 25 (Inasmuch as defendant filed his motion well outside the 120-day period, he was required to obtain leave of court to file his motion for new trial. Leave of court must be granted before the merits of the motion are reached.).

## IV. TRIAL COURT PROPERLY BARS CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 19} With regard to appellant's claim of ineffective assistance of counsel, the same is barred by the doctrine of res judicata. Res judicata "bars any claim that was or could have been raised at trial or on direct appeal." *State v. Steffen*, 70 Ohio St.3d 399 (1994). In fact, the trial court denied appellant's argument of ineffective assistance of counsel. The basis for the ineffective assistance of counsel on appeal related to appellant failing to object to certain questions, not the failure to introduce medical records from the nursing facility. However, that argument could have been made.

{¶ 20} Even if res judicata did not apply, appellant's claim of ineffective assistance of counsel would still be meritless. Appellant's claim based on the failure to introduce medical records from the nursing home is grounded in an erroneous legal premise. It is well-established that "one who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life." *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 45. "[A] defendant is not relieved of culpability for the natural consequences of inflicting serious wounds on another merely because the victim later died of complications brought on by the injury. * * * The injuries inflicted by the defendant need not be the sole cause of death, as long as they constitute a substantial factor in the death." *State v. Wilson*, 10th Dist. No. 03AP-592, 2004-Ohio-2838, ¶ 18. The defendant's claim fails.

{¶ 21} The coroner testified that the victim would not have died if appellant had not caused the global brain injury, rendering the victim comatose, unable to breathe, move, eat, drink or swallow on his own, and requiring medical intervention to breathe and a feeding tube for nutrition. (*See* Tr. at 698-99, 700-02, 723, 724, 726.) As such, the trial court's judgment is affirmed.

## V. DISPOSITION

{¶ 22} Based on the foregoing, appellant's five assignments of error are overruled. Having overruled appellant's assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

TYACK, J., concurs.
DORRIAN, P.J., concurs in judgment only.

_____